UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARDA PROPERTIES, LLC
and DAVID IASCONE
Plaintiffs

CA 06 117ML

v.

C.A. No.:

TOWN OF JOHNSTON;
ZONING BOARD OF REVIEW
OF THE TOWN OF JOHNSTON;
ANTHONY PILOZZI, Alias;
PLANNING BOARD OF THE
TOWN OF JOHNSTON;
WILLIAM RICCHIO, Alias;
ERNEST F. PITOCHELLI, Alias;
JOSEPH A. WELLS, Alias;
GEORGE CORRENTE, Alias;
JEANNE M. TRACEY-
McAREAVEY, Alias;
and JOHN DOE, Alias;
Defendants

**VERIFIED COMPLAINT**

**PARTIES PLAINTIFF**

1. Plaintiff, Charda Properties, LLC ("**Charda**") is a Limited Liability Company organized pursuant to provisions of Chapter 7-16 of the General Laws of Rhode Island, 1956, as amended (the "R.I.G.L.").

2. Plaintiff, David Iascone (hereinafter, "**Iascone**") is a resident of the Town of Johnston, County of Providence, in the State of Rhode Island and Providence Plantations (hereinafter, "Rhode Island").

## PARTIES DEFENDANT

3. Defendant, the Town of Johnston ("**the Town**") is a municipal corporation formed and existing pursuant to the laws of the State of Rhode Island.

4. The Zoning Board of Review of the Town of Johnston ("**the Zoning Board**") was created and exists pursuant to the provisions of the R.I.G.L. 45-24-56 and following the Town's adoption of a zoning ordinance under the authority and mandate of such statute.

5. Upon information and belief, defendant, Anthony Pilozzi (hereinafter, "**Pilozzi**") was Chairman of the Zoning Board at various or all relevant times described in this complaint. His role on the Zoning Board made Pilozzi a policy and/or decision-maker for the Zoning Board and/or for the Town.

6. The Planning Board of the Town of Johnston (**"the Planning Board"**) was created and exists pursuant to the mandate of R.I.G.L. 45-22-1. Its members were and are to be appointed by the Mayor of the Town with the consent of the Town Council.

7. Upon information and belief, defendant, William Ricchio **("Ricchio")** was at all relevant times described herein a resident of the Town and both a member and the Chairman of the Planning Board. His role on the Planning Board made Ricchio a policy and/or decision maker for the Planning Board and/or for the Town.

8. Upon information and belief, defendant, Ernest F. Pitochelli **("Pitochelli")** was at all relevant times described herein a resident of the Town and a member of the Johnston Town Council. His role on the Town Council made Pitochelli a policy and/or decision maker for the Town.

9. Upon information and belief, defendant, Joseph A. Wells (hereinafter, "**Wells**") was at all relevant times described herein a resident of the Town and a member of the Johnston Town Council. His role on the Town Council made Wells a policy and/or decision maker for the Town.

10. Upon information and belief, defendant, George Corrente **("Corrente")** was at all relevant times described herein a resident of the Town and acted in the capacities as its "Building Operations Director", its "Water Official" its "Town Engineer" and/or its "Zoning Official". His role in these capacities made Corrente a policy and/or decision maker for the Zoning Board, the Planning Board, and the Town.

11. Upon information and belief, defendant, Jeanne M. Tracey-McAreavey (hereinafter **"McAreavey")** was at all relevant times described herein a resident of the Town and acted in the capacity as its "Town Planner". Her role in that capacity made McAreavey a policy and/or decision maker to the Planning Board, the Zoning Board and the Town.

12. Upon information and belief, defendant, **John Doe, alias**, is or was a member of the Planning Board whose exact identity is unknown to Plaintiffs at the time of this complaint. His role on the Planning Board made John Doe, alias, a policy and/or decision maker for the Planning Board and/or the Town.

## JURISDICTION

13. This Court has original jurisdiction over this action in accordance with the provisions of 42 U.S.C. 1983, et seq.

## VENUE

14. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391, in that the events giving rise to the claims that are the subject of this action occurred in and affect citizens of Rhode Island.

## FACTUAL BACKGROUND - PLAINTIFFS

15. Charda was established and its Articles of association filed with the Rhode Island Secretary of State on or about October 9, 2002.

16. On or about October 11, 2002, one hundred (100) Charda shares were issued to Iascone.

17. On or about October 31, 2002, Charda purchased approximately twenty-eight (28) acres of undeveloped real estate at or in the vicinity of Greenville Avenue, Johnston, further identified in the land evidence records of the Town as consisting of Plat 55, Lots 24, 64, and 75, planning to develop it and refer to it is the "Pines" ("**the Pines**").

18. In late 2002, Charda engaged Kamal Hingorany of Narragansett Engineering, Inc. (**"Hingorany"**) to assist it and prepare a site plan for a proposed multi-unit luxury residential development (with multi-story building for the elderly) at the Pines.

19. Hingorany was at all times described herein a licensed Professional Engineer and Land Surveyor.

20. From approximately November, 2002 through June, 2003, Higorany directly and/or through or with the assistance of other competent professionals worked on and prepared surveys, wetland delineation, site plans, did deed research and attended to

other details for submission to the Planning Board, Zoning Board and Town in connection with the Pines development proposal.

**THE GAMES BEGIN**

21. At Iascone's request, an initial meeting took place-including representatives of Charda, Mayor William R. Macera ("**the Mayor**"), Corrente, McAreavey, and Johnston Town Council member Stephen A. Macchioni ("**Macchioni**")(representing the district in which the project would be located),

22. During this initial meeting, the Mayor expressed support, but Corrente and McAreavey voiced opposition to Charda's plans.

23. Charda was subsequently advised that McAreavey, Town Controller Barbara Joncas, and other Town officials lived in the general vicinity of the proposed Pines project.

24. As a result of opposition, Charda offered to reduce the number of units in the project and deleted the multi-story structure from its proposal. This (and all subsequent modifications described below) required Higorany to further revise the Pines plans at additional expense to Charda.

25. Several meetings with the Planning Board and/or other officials ensued and the Planning Board continually complained and requested revision after revision to the Pines proposal. This ultimately led Charda to downsize the proposed project to 160 residential units.

26. On or about July 31, 2003, Commonwealth Engineers ("Commonwealth") completed a traffic study, indicative of its opinion that a 160-unit residential development at the Pines would not adversely affect traffic conditions in the area. At no time through the filing of this complaint have the Plaintiffs been advised that there are any expert traffic studies or opinions to the contrary.

27. Notwithstanding the fact that Charda had made numerous changes and supplied more information than is customarily necessary for the planning stages in which they were involved, the opposition continued with McAreavey and the Planning Board advising that they required what would essentially be a final set of plans (including depiction of shrubbery and other plantings) before it would give its recommendation.

28. Additionally, at or in association with a public meeting of the Planning Board on or about August 9, 2003, McAreavey and the Planning Board advised the Plaintiffs that they wanted Charda to submit complete, detailed and/or final sets of plans for "every possible use" of or for the property at the Pines.

29. On or about September 1, 2003, Charda (under protest) advised the Planning Board at or in association with one of its public meetings that approximately

nine (9) house lots could be obtained in a subdivision of the Pines location under the existing Zoning By-Laws of the Town

30. Upon information and belief, Macchioni spoke with Corrente in late 2003, at which time Corrente advised that there was "no way" Charda's project was "going through" and that it would only go through "over (Corrente's) dead body".

31. In view of the irrational and patently oppressive requests being made by Corrente, McAreavey, and the Planning Board, Charda decided to revise its plans and submit the project as a low and moderate income housing development under the provisions and procedures then existing in Title 45, Chapter 53 of the General Laws of Rhode Island.

32. While Charda was having its difficulties, Iascone was not faring much better in a separate project that he was pursuing through a corporation named Dicon Corporation ("Dicon").

33. The Zoning Board heard Dicon's application on or about October 30, 2003 ("the Dicon hearing").

34. Pitochelli appeared at the Dicon hearing in opposition to its application. He gave his opinion that the ordinance involved in that situation was to allow persons who had owned substandard lots for many years to receive relief, but was not to allow builders (such as Iascone or Dicon) to come in and develop "substandard lots".

35. Dicon appealed a subsequent denial of its application, which such appeal ultimately resulted in a Providence County Superior Court decision authored by Judge Alice Gibney filed on May 16, 2005, remanding the Zoning Board's "decision" for clarification ("the Gibney opinion").

36. The Gibney opinion noted that Dicon alleged that the Zoning Board's decision "may have been affected by personal bias" on the part of some Zoning Board members and found it "curious" that the Zoning Board "recognizes (Dicon's) right to (do what it sought) but then votes to deny (on the basis it recognized)". She noted that the Zoning Board's having stated "a right to relief sought ... yet denying relief anyway without stating factual grounds" showed its "arbitrary and capricious behavior" (emphasis added). The Gibney opinion is reported at 2005 WL 1163986 (RI Super. 2005).

## THE COMPREHENSIVE PERMIT APPLICATION CUNARD

37. On January 8, 2004, Charda submitted a completed Comprehensive Permit Application ("**the Application**") to the Zoning Board.

38. Among other things, the Application was accompanied by a complete set of plans for the development of 144 condominium units to be called "The Pines Condominiums" on land located on or in the vicinity of Greenville Avenue, Johnston, Rhode Island ("**the development**").

39. The "Pines Condominiums" project and Application was submitted pursuant to the provisions of Title 45, Chapter 53 of the R.I.G.L., entitled "Low and Moderate Income Housing".

40. By the time the Application was filed, the plans for the development had been revised several times at a total cost or expense of approximately **$ 120,000.00**.

41. On January 8, 2004, in furtherance of the submission of the Application, Charda paid a filing fee in the amount of **$6,988.00**. This payment brought the total amounts paid for applications and permitting requests to approximately **$15,000.00**.

42. Upon information and belief, following submission of Charda's new Application, Corrente, Pilozzi and McAreavey discussed the submission and concocted a plan to claim that the Application was incomplete so as to deny Charda a statutorily mandated hearing.

43. Upon information and belief, following submission of Charda's new Application, Corrente, Pilozzi and McAreavey also developed a plan to argue that even if the Application were complete, there was no room in which to hold a hearing.

44. Following submission of the Application neither the Town nor the Zoning Board advised Charda or any representative of Charda that the Application and/or accompanying plans were deficient or that they were incomplete.

45. R.I.G.L. 45-53-4 thereupon required that the Zoning Board (among other things) hold a public hearing on the Application within thirty (30) days of its receipt.

46. The Zoning Board did not hold a hearing within thirty (30) days of the receipt of the Application, despite being required to do so by law.

47. Charda did not agree to waive the thirty (30) day time limitation mandated by R.I.G.L. 45-53-4.

48. Although no notice was furnished Charda or its representatives, Iascone accidentally discovered that the Zoning Board had purportedly scheduled a hearing for a date in late February 2004 (well beyond the statutory time limit described above).

49. Charda never agreed to participate in a hearing in late February 2004, did not appear at such time and place, and lacks information sufficient to form any conclusion as to whether any such "hearing" was purportedly convened by the Zoning Board.

50. McAreavey later testified that notice was indeed given and was in writing. She advised that this "writing" was a post-it note written by a clerk at McAreavey's direction. This was produced during hearings in the Mandamus Action (described below). It appeared to be written in different colors of ink and to have had its date changed. Judge Fortunato of the Superior Court has ordered it sealed in the records of that case "just so it doesn't get lost".

## CHARDA SEEKS WRIT OF MANDAMUS

51. Charda thereupon filed a complaint for Declaratory Relief and a Prerogative Writ of Mandamus against and/or naming the Town, the Zoning Board and Pilozzi as defendants or respondents in the Providence County Superior Court for the State of Rhode Island. That prior action was docketed in that court under civil action file number PC04-1084 and will hereinafter be referred to as the "Mandamus Action".

52. After the Mandamus Action was filed, the parties attempted to discuss various alternatives and the possibility of settling their disputes.

53. A meeting to discuss the situation and its possible resolution took place at the Mayor's office in the Town Hall on February 26, 2004. The Mayor was present and voiced support for the Pines project.

54. Corrente was also present at the February 26, 2004 meeting and, despite allegedly serving in only a "consultant" status and having apparently been appointed or retained in that capacity by the Mayor, openly disagreed with the Mayor, telling a Charda representative that the Pines project would only succeed "over my dead body".

55. Upon information and belief, there followed a meeting or meetings of the Johnston Town Council in Executive Session to discuss the situation and the Mandamus Action.

## THAT'S JOHNSTON

56. In a column appearing in the June 23, 2004 Providence Journal (a newspaper of general circulation in Rhode Island), Journal Staff writer Neil Shea discussed Pitochelli and observed that:

> "It's amazing how many people I've met who say '(t)hat's Johnston.' From north to south, east to west in Rhode Island, people have said that to me, often unsolicited, after they hear some bit of news about the town."

57. On or about August 4, 2004, representatives of Charda were invited and met with members of the Johnston Town Council in an "Executive Session" at the Johnston Municipal Court to discuss issued related to the Mandamus action and the development.

58. Upon information and belief, prior to the Executive Session meeting of August 4, 2004, Pitochelli expressed his position to other Town Council members that he would never support the Pines project or any project with which Iascone was involved.

59. The settlement discussions at the "Executive Session" did not go well and nothing was resolved. Indeed, colloquy strayed from potential settlement into other topics.

60. During the "Executive Session", **Wells compared Charda's housing project proposals to a strip club**, using the following analogy (appearing in a certified transcript of these proceedings, *several* such portions of which were read into the public record during the Mandamus hearings described below) to propose and promote further delay of the Pines project:

> *COUNCILMAN WELLS: Mario's Place took five years to get settled. Let's take another five years, no way am I going to agree to this.....*

61. Wells also added that he had "done his homework" and spoken with an unidentified person on the Planning Board ("John Doe, Alias" if not previously or otherwise identified in this Complaint) before the Executive Session began and as a result, asserted that "(i)f it means saying to hell with the court case or whatever it may be, then that's what we have to do".

62. The same "Executive Session" records describe an exchange that occurred between Pitochelli and one of Charda's representatives in which Pitochelli demonstrated his feelings, sense self-importance, supposed power, and his hostility by remarking that he doesn't "take crap from anybody", and "don't come here and give us crap".

63. During the same "Executive Session", Corrente and McAreavey presented their objections to the proposed development.

64. Upon information and belief, Corrente knowingly and falsely asserted that the plans that had been submitted were "barely 10%" complete and that they weren't "stamped by a professional land surveyor" (apparently either not bothering to investigate or intentionally misrepresenting Higorany's credentials that were readily available through the appropriate licensing authorities).

65. During the Executive Session, McAreavey contended that the application was "totally incomplete" and that evidence of eligibility to participate in a comprehensive permit application was "not received until January 21st" (several days after the original submissions).

66. Upon information and belief, McAreavey's statements during the Executive Session were intentionally false and misleading as was later evidenced when she testified in the Superior Court Mandamus action (on behalf of the Town) that so long as the evidence of eligibility was in the Zoning Board's file at the time a hearing was commenced, this would present no impediment to the application.

## AN OBJECT OF SCORN

67. Iascone had read and/or been informed of the aforementioned Providence Journal column by Neil Shea.

68. Iascone was also advised of the extreme hostility and character assassination being directed toward him and toward his being involved in the Pines development project.

69. Iascone had for some time been aware of other stories and events that suggested that his continuation with the project would only lead to further delays and probably doom any efforts to resolve and/or settle disputes and get approval for the Charda projects and had offered to resign from Charda.

70. For example, Town Council President, Robert Russo ("Russo") advised a representative of Charda on more than one occasion that there were members of the Town Council who would never allow the Pines project to go through so long as Iascone was part of the project. Upon information and belief, the members to whom Russo referred were Pitochelli and Wells, each of whom exhibited animosity toward Iascone.

71. Iascone concluded that since neither the Mayor, Mr. Russo nor anyone else in positions of authority in the Town was taking any action to stop this fiasco, it would be in Charda's best interest for him to resign from the Limited Liability Company.

72. On or about August 18, 2004, Iascone formally withdraw and returned all of his shares in and of Charda.

73. Charda promised that Iascone's Dicon Corporation would nevertheless be given/offered certain construction work if the project were ever able to proceed.

74. Charda duly advised Russo of Iascone's withdrawl, but discerned no change thereafter in its relationship with any of the defendants.

## EVIDENCE OF DISPARATE TREATMENT AND ANIMOSITY GROWS

75. Following the August 18, 2004 Executive Session meeting, former Johnston Town Council member Macchioni reported several events relevant to this litigation to Charda, some of which were embodied in a sworn affidavit used to support Charda's requests for relief in the Mandamus action. A copy is appended and incorporated herein, by reference, at Exhibit "A" ("the *Macchioni affidavit*").

76. The *Macchioni affidavit* detailed opposition to Charda's initial proposals by Tracey during initial meetings and Planning Board sessions. It also referenced Tracey's refusal to acknowledge that she was a property owner and lived in close proximity to the development project (*Macchioni affidavit*, paragraph 6).

77. The *Macchioni affidavit* also confirmed not only Corrente's initial objections but that the information he requested from Charda was much more than what other applicants had been asked to produce. Macchioni had often been involved with projects in his constituent area of Johnston and avers that he "never saw such personal feelings take over in any other development plan discussions with other developers" (*Macchioni affidavit*, paragraph 7).

78. The *Macchioni affidavit* further indicates that in response to efforts to settle the issues between Charda and the Town, Corrente "became more indignant and said that he would go to court and never allow this project to proceed". Macchioni also noted that it appeared to him that "other personnel in the Building Official (Corrente's) office, namely (a clerk), was (sic) acting as obstructionists whenever Charda attempted to file documents, request forms, get information, present information, or do much anything else" (*Macchioni affidavit*, paragraph 9).

79. Finally, the *Macchioni affidavit* noted that during Macchioni's tenure on the Johnston Town Council there was general and widespread opposition to affordable housing proposals (*Macchioni affidavit*, paragraph 10).

## SUPERIOR COURT GRANTS MANDAMUS

80. On November 17 and 18, 2005, the Mandamus Action was heard by and before Judge Fortunato in the Providence County Superior Court.

81. After hearing nearly two (2) days of evidence, Judge Fortunato rendered a bench decision on November 18, 2005. This was pointed in nature, roundly chastising the Town. And in the end he granted Charda all of the relief that it was seeking. A copy of the transcript of that proceeding is attached and incorporated herein as Exhibit "B".

82. An order granting Charda's Request for a Prerogative Writ of Mandamus was entered in the Mandamus action on November 29, 2005. A copy is attached hereto and incorporated herein, by reference, at Exhibit "C".

## BUT DAMAGES AND VIOLATION OF PLAINTIFFS' RIGHTS CONTINUE

83. On or about December 19, 2005, the Town appealed the decision and order in the Mandamus action to the Rhode Island Supreme Court, upon information and belief apparently attempting to keep and adopt Wells' promise to try to make Charda wait for "years".

84. All preceding paragraphs of this Verified Complaint are restated and incorporated, by reference, in each Count that follows.

## COUNT ONE
## (Denial of Equal Protection – United States Constitution – Charda)

85. The actions of defendants Pilozzi, Ricchio, Pitochelli, Wells, Corrente and McAreavey toward Charda may fairly be said to be and constitute the acts or actions of the Zoning Board, Planning Board and/or Town.

86. The actions of defendants, Pilozzi, Ricchio, Pitochelli, Wells, Corrente and McAreavey, as aforesaid, have caused Charda to be subjected to the intentional violation or deprivation of a federally-protected right, resulting in constitutional injury as a result of its being selectively and disparately treated when compared with others similarly situated.

87. Alternatively, such actions of the defendants have intentionally violated or deprived Charda's federally-protected rights, resulting in constitutional injury as a result of its being made part of a selectively and disparately treated category of unwelcomed developers when compared to others generally able to develop projects in the Town.

88. The selective treatment afforded Charda by the Town has been based upon impermissible considerations, such as the intent to inhibit or punish the exercise of Charda's Constitutional Rights or to maliciously and/or in bad faith injure Charda.

89. As a result of such disparate treatment, Charda have been subjected to considerable, unwarranted and increased expense, loss of time and the costs associated with such delay, increased engineering expense, having to incur legal fees, and the loss of advantageous business opportunities.

90. The actions of such defendants toward Charda have been arbitrary, capricious, malicious, pretextural, and unrelated to any legitimate or rational objective of the Zoning Board, Planning Board and/or the Town.

91. Charda is accordingly entitled to compensatory damages, attorney fees and costs against the Zoning Board, Planning Board and/or Town for its violation of the Equal Protection clause of Amendment XIV to the Constitution of the United States of America, as applied to the State of Rhode Island and its political subdivisions, and pursuant to 42 U.S.C. 1983, et. seq.

92. Charda is also entitled to both compensatory and exemplary or punitive damages, attorney fees, interest and costs against defendants Pilozzi, Ricchio, Pitochelli, Wells, Corrente and McAreavey, for their having acted under color of law resulting in their violation of the Equal Protection clause of Amendment XIV to the Constitution of the United States of America, as applied to the State of Rhode Island and its political subdivisions, and pursuant to 42 U.S.C. 1983, et. seq.

**COUNT TWO**
**(Denial of Equal Protection – United States Constitution – Iascone)**

93. The actions of defendants Pitochelli and Wells toward Iascone may fairly be said to be and constitute the acts or actions of the Zoning Board, Planning Board and/or Town.

94. The actions of defendants, Pitochelli and Wells, as aforesaid, have caused Iascone to be subjected to the intentional violation or deprivation of a federally-protected right, resulting in constitutional injury as a result of his being selectively and disparately treated when compared with others similarly situated.

95. Alternatively, such actions of the defendants have intentionally violated or deprived Iascone's federally-protected rights, resulting in constitutional injury as a result of his being made part of a selectively and disparately treated category of unwelcomed individuals when compared to others generally able to develop projects and/or transact business in the Town.

96. The selective treatment afforded Iascone by the Town has been based upon impermissible considerations, such as the intent to inhibit or punish the exercise of Iascone's Constitutional Rights or to maliciously and/or in bad faith injure Charda.

97. As a result of such disparate treatment, Iascone has been subjected to considerable, unwarranted and increased expense, loss of time and the costs associated with such delay, increased engineering expense, having to incur legal fees, and the loss of advantageous business opportunities.

98. The actions of such defendants toward Iascone have been arbitrary, capricious, malicious, pretextural, and unrelated to any legitimate or rational objective of the Zoning Board, Planning Board and/or the Town.

99. Iascone is accordingly entitled to compensatory damages, attorney fees and costs against the Town for its violation of the Equal Protection clause of Amendment XIV to the Constitution of the United States of America, as applied to the State of Rhode Island and its political subdivisions, and pursuant to 42 U.S.C. 1983, et. seq.

100. Iascone is also entitled to both compensatory and exemplary or punitive damages, attorney fees, interest and costs against defendants Pitochelli and Wells, for their having acted under color of law resulting in their violation of the Equal Protection clause of Amendment XIV to the Constitution of the United States of America, as applied to the State of Rhode Island and its political subdivisions, and pursuant to 42 U.S.C. 1983, et. seq.

## COUNT THREE

## (Conspiracy to Interfere with Civil Rights – Individual Defendants, Acting in their Individual Capacities - Charda)

101. In accordance with 42 U.S.C. 1985 (2), it is illegal for two or more persons in any state to conspire with intent to deny to any citizen the equal protection of laws, or to injure any citizen for attempting to enforce the right of any person to the equal protection of the laws.

102. Pursuant to 42 U.S.C. 1985 (3), in any such case of conspiracy, if one or more conspirators do, or cause to be done, any act in furtherance of the object of such conspiracy, any injured or deprived party may have an action for recovery of damages occasioned by such injury or deprivation against one or more of the conspirators.

103. Upon information and belief, the individually named defendants combined, conspired and confederated in one or more instances to deny Charda the equal protection of the law and/or to injure Charda for attempting to exercise and enforce its rights to enjoy the equal protection of the law.

104. Upon information and belief, the individual defendants (or some of them) thereupon committed or caused to be committed overt acts in furtherance of the conspiracy, some or all of which such overt acts are described in paragraphs 22-24, 26, 28, 31, 43-51, 54-56, 58-67 and 76-78, above.

105. Due to the secretive nature of conspiracies, Charda is presently unaware of all meetings, acts, events and/or persons involved in these conspiratorial activities, but upon information and belief some or all of the individual defendants have participated in additional meetings, actions and events in furtherance thereof.

106. Upon information and belief, the actions of the individual defendants, as aforesaid, were undertaken for one or more of the purposes declared illegal under 42 U.S.C. 1985 (2) and (3).

107. As a result of such conspiracy or conspiracies by the individual defendants, Charda has been damaged, further incorporating paragraph 90 of this complaint as if fully set forth herein, and has been otherwise greatly damnified.

108. Charda is accordingly entitled to both compensatory and exemplary or punitive damages against all the individual defendants, plus interest, costs, and reasonable attorney fees.

## COUNT FOUR

## (Conspiracy to Interfere with Civil Rights – Defendants Pitochelli and Wells , Acting in their Individual Capacities - Iascone)

109. Paragraphs 102 and 103 of Count Three are restated and incorporated herein, by reference.

110. Upon information and belief, defendants Pitochelli and Wells combined, conspired and confederated in one or more instances to deny Iascone the equal protection of the law and/or to injure Iascone for attempting to exercise and enforce his rights to enjoy the equal protection of the law.

111. Defendants Pitochelli and Wells thereupon committed or caused to be committed overt acts in furtherance of the conspiracy, some or all of which such overt acts are described in paragraphs 33-37, 59 and 69-75, above.

112. Due to the secretive nature of conspiracies, Iascone is presently unaware of all meetings, acts, events and/or persons involved in these conspiratorial activities, but upon information and belief Pitochelli and Wells participated in additional meetings, actions and events in furtherance of such civil conspiracy.

113. Upon information and belief, the actions of Pitochelli and Wells, as aforesaid, were undertaken for one or more of the purposes declared illegal under 42 U.S.C. 1985 (2) and (3).

114. As a result of such conspiracy or conspiracies by and involving Pitochelli and Wells, Iascone has been greatly damaged through the loss of his participation as a member or shareholder of Charda.

115. Iascone is accordingly entitled to both compensatory and exemplary or punitive damages against Pitochelli and Wells, plus interest, costs and reasonable attorney fees.

**COUNT FIVE**

**(Extortion Directed at Iascone)**

116. This court has pendant jurisdiction over certain state claims, including those brought pursuant to the provisions of R.I.G.L. 9-1-2 (allowing a plaintiff to bring a cause of action premised upon a criminal act even though no criminal complaint for the crime or offense has been filed).

117. Under R.I.G.L. 11-42-2, the offense of EXTORTION is defined as pertaining to and including any person who verbally, maliciously threatens any injury to the person or property of another, with intent to compel that person to do any act against his or her will.

118. Section 11-42-1.1 of the R.I.G.L. is entitled "EXTORTION BY A PUBLIC OFFICIAL". This law provides in pertinent part that any elected or appointed official of any city or town of the State of Rhode Island who, under color or pretense of office, commits or attempts to commit an act of extortion shall be guilty of a crime.

119. Upon information and belief, the actions of Pitochelli and Wells wherein they proclaimed to other members of the Town Council that they would never support any project in which Iascone was involved were made with the knowledge that their position and vows concerning Iascone would more likely than not be conveyed to Charda and Iascone.

120. Upon information and belief, the actions of Pitochelli and Wells were made maliciously with the intent to compel or attempt to compel Iascone to involuntarily withdraw his membership in Charda and, indeed, from any and all projects in the Town.

121. Upon information and belief, the actions of Pitochelli and Wells described in this count were made under color or pretense of office.

122. As a result of the actions of Pitochelli and Wells and in an effort to allow Charda to proceed with its plans without difficulties due to his presence as a member, Iascone withdrew from Charda .

123. As a result of the actions of Pitochelli and Wells, Iascone has suffered the loss of a share in Charda that is reasonably anticipated to have an ultimate value in excess of a million dollars, entitling him to compensatory and punitive or exemplary damages, plus interest and costs.

## COUNT SIX

**(Interference with Prospective Business Relationships – All Defendants - Charda)**

124. From and since the time the Plaintiffs first met with the Mayor and others as described in paragraph twenty-two (22), above, the defendants were aware that Charda expected to construct a residential development project at the Pines location.

125. Notwithstanding their knowledge of Charda's reasonable business expectations, defendants intentionally interfered with Charda's efforts to proceed with its development plans through a variety of contrived schemes as described above.

126. As a direct and proximate result of such intentional interference by defendants with its business plans and expectations, Charda was damaged and it specifically incorporates, by reference, paragraph 90 of this Complaint in further explanation of how and the extent to which that has occurred.

127. Wherefore, Charda demands judgment against the Zoning Board, Planning Board and the Town for compensatory damages and against the individual defendants for compensatory and punitive or exemplary damages, plus interest and costs.

## COUNT SEVEN

**(Interference with Business Relationship – Pitochelli, Wells, and Town – Iascone)**

128. At all material times, Iascone enjoyed an advantageous business relationship with Charda which such relationship was of a present and/or anticipated future economic benefit to him, both during the aforementioned times, at present, and in the future.

129. Defendants knew of the nature of Charda's business plans and that it would be reasonably anticipated that Iascone's involvement with Charda was an essential and an integral part of his business dealings and property rights.

130. Through improper motive or means, defendants have unjustifiably, directly and indirectly, interfered with Iascone's advantageous business relationship with Charda and have maligned and defamed Iascone through their actions.

131. As a direct, natural and proximate result of the unjustifiable actions of defendants, Iascone has lost the advantage of his business relationship with Charda and has been thereby damaged, incurring a loss of business, profits, goodwill and additional, unwarranted expenses. His losses are reasonably anticipated to greatly exceed one million ($1,000,000 plus) dollars.

132. Iascone is accordingly entitled to compensatory damages for such interference from the Town and from such individual defendants in their individual capacities, with all prejudgment interest permitted by law and his costs of suit.

## DEMANDS FOR RELIEF AND CLAIM OF JURY TRIAL

WHEREFORE, Plaintiffs demand judgment against Defendants, the Zoning Board, Planning Board and/or Town for compensatory damages, against the individually-named Defendants for compensatory and punitive or exemplary damages and from all Defendants for interest, costs, attorney fees, and a trial, by jury.

**VERIFICATION – CHARDA PROPERTIES, LLC**

The undersigned, being duly sworn upon oath, hereby depose and say that:

1. I am the Member authorized representative of the Plaintiff, CHARDA PROPERTIES, LLC., and am executing this Verification on its behalf as its free act and deed.

2. I hereby verify that the facts and matters relating to CHARDA PROPERTIES, LLC that are contained in the foregoing verified complaint are, to the best of its knowledge, true and accurate.

3. With respect to those matters that are asserted to be "upon information and belief," such matters are believed to be true as stated.

CHARDA PROPERTIES, LLC, by:

Z______________________

H. Charles Tapalian
Its Member and Authorized Representative

Subscribed and sworn before me by H. Charles Tapalian, in his capacity as Member and Authorized Representative of CHARDA PROPERTIES, LLC, at Warwick, Rhode Island, this 14 day of March, 2006.

Jennifer R Case
Notary Public

## VERIFICATION – DAVID IASCONE

The undersigned, being duly sworn upon oath, hereby depose and say that:

1. I am a Plaintiff in this matter.

2. I hereby verify that the facts and matters relating to myself that are contained in the foregoing Verified Complaint are, to the best of my knowledge, true and accurate.

3. With respect to those matters that are stated "upon information and belief", I believe that they are as stated.

David Iascone

Subscribed and sworn before me at Warwick, Rhode Island, this 14th day of March, 2006.

Notary Public

Plaintiffs,
By their Attorney,

John B. Reilly (#1811)
John Reilly & Associates
Suite 330 – Summit West
300 Centerville Road
Warwick, R.I. 02886
(401) 739-1800
(Fax) 738-0258